IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| SOUTHWIRE COMPANY, | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 6:09-cv-00289 |
| | § | |
| v. | § | |
| | § | |
| CERRO WIRE INC. and | § | JURY TRIAL DEMAND |
| ENCORE WIRE CORPORATION, | § | |
| | § | |
| Defendants. | § | |

## ENCORE WIRE CORPORATION'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

Defendant Encore Wire Corporation ("Encore") respectfully files its Second Amended Answer, Affirmative Defenses, and Counterclaims to Plaintiff Southwire Company's ("Plaintiff" or "Southwire") Original Complaint ("the Complaint").  Except as expressly admitted hereafter, Encore denies each allegation contained in the Complaint.  In response to the specific allegations in the Complaint, Encore states as follows:

### PURPORTED NATURE OF ACTION

1.      Encore admits the Complaint purports to be an action for infringement of United States Patent No. 7,557,301, entitled "Method of Manufacturing Electrical Cable Having Reduced Force for Installation" ("the '301 Patent"), under 35 U.S.C. §1 *et seq.*, but Encore denies any wrongdoing or liability.

### PARTIES

2.      Encore admits that Plaintiff is a Delaware corporation with its principal place of business at One Plaintiff Drive, Carrollton, Georgia 30119.  Encore is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 2 of the Complaint, and therefore denies the same.

3.      Admitted.

4.      Encore is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 4 of the Complaint, and therefore denies the same.

## JURISDICTION AND VENUE

5.      Encore admits that this court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338.

6.      Admitted.

7.      Admitted.

8.      Admitted.

9.      Encore admits that this Court has jurisdiction and that Encore does business in this district.  Encore denies the remaining allegations of paragraph 9 of the Complaint.

10.      Encore is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10 of the Complaint, and therefore denies the same.

11.      Encore is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11 of the Complaint, and therefore denies the same.

12.      Encore is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12 of the Complaint, and therefore denies the same.

13.      Encore is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13 of the Complaint, and therefore denies the same.

14.      Encore admits that venue is proper in this District.

## PURPORTED UNDERLYING FACTS

15.    Encore is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 of the Complaint, and therefore denies the same.

16.    Encore admits that the '301 Patent bears on its face that it is a continuation of application Serial No. 10/952,294, now U.S. Patent No. 7,411,129 ("the '129 Parent Patent"). Encore is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 16 of the Complaint, and therefore denies the same.

17.    Denied.

18.    Denied.

19.    Encore is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 of the Complaint, and therefore denies the same.

## PURPORTED COUNT I: CLAIM FOR INFRINGEMENT OF U.S. PATENT NO. 7,557,301 AGAINST ENCORE

20.    Encore hereby incorporates by reference its responses as set forth in their entirety in Paragraphs 1 through 19 of this Answer.

21.    Denied.

22.    Denied.

23.    Denied.

24.    Denied.

25.    Denied

## PURPORTED COUNT II: CLAIM FOR INFRINGEMENT OF U.S. PATENT NO. 7,557,301 AGAINST CERRO

26.    Encore hereby incorporates by reference its responses as set forth in their entirety in Paragraphs 1 through 19 of this Answer.

27.     Encore is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27 of the Complaint, and therefore denies the same.

28.     Encore is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28 of the Complaint, and therefore denies the same.

29.     Encore is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29 of the Complaint, and therefore denies the same.

30.     Encore is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30 of the Complaint, and therefore denies the same.

31.     Encore is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31 of the Complaint, and therefore denies the same.  Encore denies that Southwire is entitled to any of the relief Southwire requests.

## DEMAND FOR JURY TRIAL

Encore demands a jury trial for all issues appropriately tried to a jury.

## AFFIRMATIVE DEFENSES

Without assuming any burden or obligation other than that imposed by operation of law, Encore asserts the following defenses relating to Plaintiff's allegations of patent infringement with respect to the '301 Patent:

### First Affirmative Defense
### (Failure to State a Claim)

32.     The Complaint fails to state a claim upon which any relief can be granted.

### Second Affirmative Defense
### (Non-infringement)

33.     Encore hereby incorporates by reference its responses as set forth in their entirety in Paragraphs 1 through 32 of this Answer.

34.     Encore does not infringe and has not infringed any valid and enforceable claim of the '301 Patent, literally, directly, indirectly, willfully, contributorily, by way of inducement, under the doctrine of equivalents, and/or otherwise.

### Third Affirmative Defense
### (Patent Invalidity)

35.     The '301 Patent is invalid for failure to meet the conditions of patentability of 35 U.S.C. § 101 *et seq.*, including, without limitation, §§ 102, 103, and/or 112.

### Fourth Affirmative Defense
### (Prosecution History Estoppel)

36.     Plaintiff is estopped from construing any claim of the '301 Patent to cover, either literally or by application of the doctrine of equivalents, any method or product manufactured, used, sold, offered for sale, or imported by Encore because of actions taken and arguments made by Plaintiff in the United States Patent and Trademark Office during prosecution of the '301 Patent and the '129 Parent Patent.

### Fifth Affirmative Defense
### (Equitable Estoppel)

37.     Plaintiff's claims for relief and prayer for damages are barred, in whole or in part, because equitable estoppel renders the '301 Patent unenforceable.

### Sixth Affirmative Defense
### (Inequitable Conduct)

38.     The '301 Patent is unenforceable due to Plaintiff's inequitable conduct in prosecuting the '301 Patent and the '129 Parent Patent, the facts and circumstances of which are set forth below.

39.     Plaintiff engaged in inequitable and fraudulent conduct through the intentional failure to disclose in any Information Disclosure Statement ("IDS"), or in any other submission to the PTO, material information in the form of known prior art.

40.     Individuals substantively involved in prosecuting the '301 Patent and '129 Parent Patent withheld highly material information when they failed to disclose U.S. Patent No. 5,227,080 ("the '080 Patent") to the United States Patent and Trademark Office ("PTO").  This intentional failure to disclose was a violation of their duty of candor and good faith.

41.     Individuals substantively involved in prosecuting the '301 Patent and '129 Parent Patent further breached their duty of candor and good faith by withholding known material prior art, specifically, U.S. Patent No. 4,673,516 ("the '516 Patent").

42.     The individuals further breached their duty of candor and good faith by asserting arguments during the prosecution of the '301 Patent and '129 Parent Patent that could not have been reasonably made had the '080 and '516 Patents been disclosed.  A reasonable examiner would have considered it important to know the information disclosed in the '080 and '516 Patents, and this information would have established, by itself or in combination with other prior art, a *prima facie* case of unpatentability for the '301 Patent and '129 Parent Patent.

43.     In accordance with 37 C.F.R. § 1.56 and the Manual of Patent Examining Procedure, each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the PTO, which includes a duty to disclose to the PTO all information known to that individual to be material to patentability.  This duty extends to each inventor named in the application, each attorney or agent who prepares or prosecutes the application, and every other person substantively involved in the preparation or prosecution of

the application, who is associated with the assignee or with anyone to whom there is an obligation to assign the application.  This duty, therefore, extends at least to every inventor named in the '129 Parent Patent and the '301 Patent, Kenneth R. Glaser ("Mr. Glaser") of the Gardere Wynne Sewell law firm, and other individuals expected to be identified in discovery.

44.     Kenneth R. Glaser is identified as the prosecuting attorney on the face of both the '301 Patent and the '129 Parent Patent.  Mr. Glaser is also identified as the prosecuting attorney on the face of two other relevant pieces of material prior art which were not disclosed to the PTO: the '080 and '516 Patents. The '080 and '516 Patents both name Johnny D. Berry as the inventor and list Integral Corporation as the assignee.

45.     On September 2, 1986, Mr. Glaser filed U.S. Patent Application No. 06/902,514, which issued as the '516 Patent on June 16, 1987.

46.     On October 10, 1990, Mr. Glaser filed U.S. Patent Application No. 07/594,938, which issued as the '080 Patent on July 13, 1993.

47.     On September 28, 2004, Mr. Glaser filed U.S. Patent Application No. 10/952,294, which issued as the '129 Parent Patent on August 12, 2008.

48.     On January 21, 2008, Mr. Glaser filed U.S. Patent Application No. 12/017,222, which issued as the '301 Patent on July 7, 2009.

49.     Despite being relevant known material prior art, Mr. Glaser did not disclose either the '080 or the '516 Patents to the PTO during the prosecution of either the '129 Parent Patent or the '301 Patent.

50.     The '080 Patent is material to at least claims 1, 2, 6, 10, 13-16, 18, and 21 of the '301 Patent and at least claims 1, 4, 6, and 8 of the '129 Parent Patent.  The '516 Patent is relevant to the obviousness of all the claims in both the '129 Parent Patent and '301 Patent. Moreover, the '080 and '516 Patents contain disclosures which would have precluded arguments Mr. Glaser made during the prosecution of the '129 Parent Patent and the '301 Patent.

### Material Information: the '080 Patent

51.     The '080 Patent discloses lubricious agents that migrate to a cabling surface to replenish and restore surface lubricity.[1]  The lubricious agents continuously migrate to the cabling surface resulting in a continuously lubricious surface.[2]  As a result of the continuously lubricious surface, the coefficient of friction of the surface is reduced and lower pulling forces are achieved.[3]  The '080 Patent also discloses mixing a lubricious agent with an absorbing substrate in a mixer.[4]

52.     At least claims 1, 6, 10, 13-16 , 18, and 21 of the '301 Patent and at least claims 1, 4, 6, and 8 of the '129 Parent Patent involve a lubricant that migrates to be available at the exterior cabling surface of a finished cable at the time of installation.  These claims also require introducing or combining the lubricant prior to formation of a jacket or sheath to provide a reduced coefficient of friction and required pulling force.

---

[1] *See* '080 Patent col.2 ls.37-41, col.3 ls.22-25, claim 1, claim 4.

[2] *See* '080 Patent col.3 ls.35-41, col.4 ls.45-55, col.5 ls.3-8, claim 1, claim 4.

[3] *See* '080 Patent col.3 ls.35-41.

[4] *See* '080 Patent col.3 ls.52-57.

53.     The '080 Patent discloses a lubricant that continuously migrates to the cabling surface resulting in a continuously lubricous surface, a reduction of the coefficient of friction, and a reduction in the required pulling force as a consequence of the migration.[5]  The '080 Patent also discloses the introduction of the lubricant prior to the formation of the cabling surface.[6] Accordingly, the '080 Patent discloses material information that is relevant to the claims of the '301 Patent and the '129 Parent Patent.

### Material Information: the '516 Patent

54.     The '516 Patent discloses an aqueous lubricant for use in cabling installation which reduces the coefficient of friction between the cabling surfaces.[7]  Accordingly, the '516 Patent is material prior art to the '129 Patent, as it discloses at least two elements of claim 1 of the '129 Patent.

55.     The '516 Patent discloses "a method for reducing the coefficient of friction between a cable and the outer conduit through which the cable is pulled."[8]  This language is virtually identical to the language of claim 1 in the '301 Patent: "a method of manufacturing a finished electrical cable having … a preselected lubricant … to provide a reduced coefficient of friction of said outermost exterior surface and also reduce the amount of force required to pull the cable during its installation."

---

[5] *See* '080 Patent col.2 ls. 37-41, col.3 ls. 35-41, col.4 ls. 45-49.

[6] *See* '080 Patent col.3 ls. 16-41.

[7] *See* '516 Patent col.1 ls. 4-23.

[8] *See* '516 Patent claim 1.

Prosecution of  the '129 Parent Patent

56.    On September 14, 2007, Mr. Glaser and William H. Mayo III ("the Examiner") had a telephone interview.[9]    Later that day, upon the Examiner's recommendation, Plaintiff amended the independent claims of the '129 Parent Patent to include a lubrication of a type that either migrates or permeates through a material to be available at the exterior surface.[10]  As a direct result of this migration limitation amendment, the '129 Parent Patent was allowed to issue.[11]  Because the addition of the migration limitation resulted in the allowance of the '129 Parent Patent, the limitation was material to the patentability of the '129 Parent Patent.

57.    The '080 patent is material to the patentability of the '129 Parent Patent because it discloses the continuous migration of a lubricant to be continuously available at the cabling surface during installation.[12]  This disclosure, in light of the migration limitation amendment, would be considered by a reasonable examiner as important in deciding whether to allow the '129 Parent Patent to issue.

58.    The '516 Patent is material to the patentability of the '129 Parent Patent because it discloses a lubricant for use in cabling installation which reduces the coefficient of friction between the cabling surfaces.[13]  This disclosure would be considered by a reasonable examiner as important in deciding whether to allow the '129 Parent Patent to issue.

---

[9] *See* Interview Summary dated Sept. 15, 2007.

[10] *See* Amendment filed Sept. 14, 2007, p.1-6.

[11] *See* Notice of Allowability dated Sept. 15, 2007.

[12] *See* '080 Patent claim 4.

[13] *See* '516 Patent col.1 ls. 4-23.

59.     The '080 and '516 Patents are not cumulative of the prior art cited in the '129 Parent Patent prosecution history.  The '080 and '516 Patents are relevant material prior art and disclose combinations of limitations not found in any single piece of prior art considered during the '129 Parent Patent's prosecution.

60.     On information and belief, during the entire prosecution of the '129 Parent Patent, Mr. Glaser knew or should have known that the '080 and '516 Patents were material to one or more claims of the '129 Parent Patent.  Despite his knowledge that the '080 Patent disclosed material information about a pulling lubricant and the continuous migration of lubricious agents to the cabling surface to be available at the time of installation, disclosures which make the '080 Patent material and not cumulative to the prior art considered by the PTO, Mr. Glaser failed to disclose the '080 Patent to the PTO for consideration in the '129 Parent Patent application. Further, despite his knowledge that the '516 Patent disclosed a lubricant for use in cabling installation which reduces the coefficient of friction between the cabling surfaces, a disclosure which is highly similar to claim 1 of the '129 Patent, Mr. Glaser failed to disclose the '516 Patent to the PTO for consideration in the '129 Parent Patent application.  In doing so, Mr. Glaser violated the duty of good faith and candor by withholding material information with the intent to deceive the PTO.

61.     Had the '080 and '516 Patents been disclosed to the PTO, the examiner would have been able to reject one or more claims of the '129 Parent Patent because the '080 and '516 Patents disclose material information which would have been critical in deciding whether to allow the '129 Parent Patent's claims.  Additionally, the '080 and '516 Patents are not cumulative to prior art considered during prosecution.

62.     A reasonable examiner would have considered it important to know the material information disclosed by the '080 and '516 Patents, and this information would have established, by itself or in combination with other information, a *prima facie* case of unpatentability of the '129 Parent Patent.

<u>Re-Examination of the '129 Parent Patent</u>

63.     On September 26, 2008, Cerro Wire Inc. filed a request for re-examination to invalidate the '129 Parent Patent.[14]  The claims of the '129 Parent Patent were rejected by the Examiner over DeCosta.[15]  In response to the rejections, Mr. Glaser argued that DeCosta does not teach a lubricant that migrates to be available at the surface at the time of installation.[16]  Mr. Glaser explicitly argued that the '129 Parent Patent was distinct from the prior art in that none of the prior art disclosed the lubricant being available at the surface at the time of installation.[17]

64.     The '080 Patent discloses a pulling lubricant that provides a lower pulling force when the cable is extended through the conduit (i.e. at the time of installation).[18]  Therefore,  the '080 Patent discloses a limitation which, according to Plaintiff, is not disclosed in the cited prior art.  Accordingly, the '080 Patent is material and not cumulative to DeCosta or any other cited reference.

---

[14] *See* Request for *Inter Partes* Reexamination under 35 U.S.C. §§ 311-318.

[15] *See* Office Action dated Dec. 5, 2008, p. 10 (rejecting claims 1-8 under 35 U.S.C. §103(a) as being unpatentable over Arroyo in view of DeCosta).

[16] *See* Amendment filed Feb. 5, 2009, p.15.

[17] *See* Response to Action Closing Prosecution filed Sept. 1, 2009, p.14 ("What is also clearly not taught or suggested by the combination of these references is that a lubricant type needs to be selected that, either through migration or permeation, will be available at the cable exterior surface <u>at the time of installation</u>, not only <u>before</u> or <u>after</u> such installation").

[18] *See* the '080 Patent col. 2 ls.37-41.

65.    Had the '080 Patent been properly disclosed to the PTO, Mr. Glaser would have been precluded from arguing that the prior art did not disclose the lubricant that will be available at the cabling surface at the time of installation.

<u>Prosecution of the '301 Patent</u>

66.    The cited prior art in the '301 prosecution history does not disclose in the field of electrical cabling, the combination of lubricious agents which migrate to the cabling surface to be continuously available at the time of installation, resulting in a reduced coefficient of friction. Moreover, claim 2 of the '301 requires a lubricant of the type that permeates a jacket to be continuously available at the surface during the cable's installation.[19]   No single reference considered during prosecution of the '301 Patent discloses such a limitation.

67.    The '080 Patent discloses lubricious agents which migrate to the cabling surface to be continuously available at the time of installation, resulting in a reduced coefficient of friction as a direct consequence of the migration in the field of electrical cabling.[20]   Because the '080 Patent discloses continuous availability,[21] it is not cumulative to the prior art considered in the '301 prosecution history.

68.    Further, the specification language in the '080 Patent is highly similar to the claim language in the '301 Patent.  At col. 3, lns. 22-25, the '080 Patent discloses "[t]hese lubricious agents are of the type that . . . migrate to such surfaces to replenish and restore surface lubricity,"

---

[19] *See* '301 Patent claim 2.

[20] *See* '080 Patent col.3 ls. 35-41 ("As a consequence of this formation, and as illustrated in FIG. 3, the conduit wall is composed of a central zone 17 having a reservoir of lubricious agents 16A migrate as they are depleted from outer conduit surfaces 20, thus resulting in continuously lubricious outer surfaces, and consequent reduction in coefficient of friction."); '080 Patent col.4 ls. 39-54.

[21] *See* '080 Patent claim 4.

which closely resembles claim 1 in the '301 Patent of "said lubricant is of the type which migrates . . . to be available at said outermost exterior surface." As the prosecuting attorney on the face of the '080 Patent and the '301 Patent, Mr. Glaser knew or should have known that the similarity in the language of the disclosures in the '080 Patent constituted material information which should have been disclosed to the PTO as prior art for the '301 Patent.

69.     The '516 Patent is material because it discloses a lubricant for the installation of electrical cabling, which reduces the coefficient of friction between the cabling surfaces.

70.     On information and belief, during the entire prosecution of the '301 Patent, Mr. Glaser knew or should have known that the '080 and '516 Patents were material to one or more claims of the '301 Patent.  Despite his awareness that the '080 Patent discloses material information about a pulling lubricant that migrates to the cabling surface to be available at the time of installation and that the '080 Patent was not cumulative to the prior art considered by the PTO, Mr. Glaser withheld the '080 Patent from the PTO for consideration in the '301 Patent application with the intent to deceive the PTO.  Further, despite his knowledge that the '516 Patent discloses material information about a lubricant for the installation of electrical cabling, which reduces the coefficient of friction between the cabling surfaces and that the '516 Patent was not cumulative to the prior art considered by the PTO, Mr. Glaser withheld the '516 Patent from the PTO for consideration in the '301 Patent application with the intent to deceive the PTO. In doing so, Mr. Glaser violated the duty of candor and good faith and committed inequitable conduct in prosecuting the '301 Patent.

71.     Had the '080 and '516 Patents been disclosed to the PTO, the examiner would have been able to reject one or more claims of the '301 Patent because the '080 and '516 Patents

disclose material information, which would have been critical in deciding whether to allow the '301 Patent's claims.  Additionally, the '080 and '516 Patents are not cumulative to prior art considered during prosecution.

<u>Intent to Deceive the PTO</u>

72.     As prosecuting attorney for both the '080 Patent and the '516 Patent, Mr. Glaser knew or should have known the patents were material prior art.  Mr. Glaser knew that the '080 and '516 Patents were in the same field as the '129 Parent Patent and the '301 Patent.  Further, Mr. Glaser knew or should have known what the '080 and '516 Patents disclosed.  Mr. Glaser's decision to withhold the '080 and '516 Patents demonstrates an intent to deceive the PTO. Moreover, given the highly material nature of the '080 Patent, Mr. Glaser's intent to deceive the PTO may be inferred from the facts.

73.     The fact that Mr. Glaser prosecuted multiple patents ('080 and '516 Patents) for the same inventor (Johnny D. Berry), which were in the same field as the '129 Parent Patent and the '301 Patent and disclosed a combination of elements directly related to the claimed inventions of the '129 and '301 Patents, also indicates Mr. Glaser's intentions to deceive the PTO.

74.     As prosecuting attorney, Mr. Glaser knew or should have known of the materiality of the disclosures in the '080 Patent.  An intent to deceive may be inferred from (1) Mr. Glaser's knowledge of the '080 Patent and the material information it disclosed and (2) Mr. Glaser's withholding of the '080 Patent, which was highly material to the patentability of the '301 Patent and '129 Parent Patent.

75.     Plaintiff added the migration limitation to the '129 Parent Patent at the Examiner's suggestion based upon the September 14, 2007, phone interview between Mr. Glaser and the Examiner.[22]  As a direct result of Plaintiff's addition of the migration language, the PTO issued a Notice of Allowance and the patent was allowed to issue.  Accordingly, the migration limitation was critical to the '129 Parent Patent because its addition directly resulted in the issuance of the '129 Parent Patent.  Moreover, because the migration limitation language also appears in the claims of the '301 Patent, the migration limitation is critical to the '301 Patent.

76.     Because the '080 Patent discloses the migration of lubricious agents to be available at the cabling surface,[23] it is highly material to both the '129 Parent Patent and the '301 Patent.  As the prosecuting attorney for the '080 Patent, Mr. Glaser, knew or should have known that the '080 Patent contained highly material disclosures, which a reasonable examiner would have considered important in examining the '301 Patent.

77.     Mr. Glaser was the prosecuting attorney of the '080 Patent, the '301 Patent, and the '129 Parent Patent.  The migration limitation was added as a result of a suggestion by the Examiner in order to allow the '129 Parent Patent to issue.  This same migration limitation was disclosed in the '080 Patent and was material to the examination of the '129 Parent Patent.  Therefore, Mr. Glaser knew or should have known of the materiality of the information disclosed in the '080 Patent even if the examiner did not reject the claims based on the information.

78.     Mr. Glaser's decision to withhold the '516 Patent also indicates an overall intention to withhold material prior art contained in the '080 and '516 family of patents for the

---

[22] *See* Interview Summary dated Sept. 15, 2007.

[23] *See* '080 Patent col.3 ls. 22-25.

purposes of misleading the PTO.  A reasonable examiner would have considered it important to know the information disclosed in the '080 and '516 family of patents.

79.     On information and belief, Mr. Glaser made a deliberate decision to withhold the '080 and '516 Patents from the PTO.  Mr. Glaser prosecuted the '080 Patent, the '516 Patent, the '301 Patent, and the '129 Parent Patent, therefore, Mr. Glaser knew of the '080 Patent and the '516 Patent.   Moreover, Mr. Glaser knew or should have known that the '080 and '516 Patents were relevant prior art that were material to the patentability of the '301 Patent and '129 Parent Patent, particularly in light of the arguments he made during prosecution and the similarity of the patent language.

## Seventh Affirmative Defense
### (Reservation of Defenses)

80.     Encore reserves the right to assert any other affirmative defenses that may be revealed to it during discovery.

## ENCORE'S COUNTERCLAIMS

### THE PARTIES

81.     Encore is a Delaware Corporation with its principal place of business at 1329 Millwood Road, McKinney, Texas 75069.

82.     Upon information and belief, Southwire is a Delaware Corporation with its principal place of business at One Southwire Drive, Carrollton, Georgia 30119.   Alflex Corporation ("Alflex") is, as of July 30, 2004, a wholly-owned subsidiary of Southwire.  Prior to Southwire's acquisition, Alflex's principal place of business was in Long Beach, California. Upon information and belief, as part of its acquisition, Southwire assumed Alflex's liabilities.

Southwire is the successor-in-interest to Alflex.  Richard Temblador is an employee and agent of Southwire, who currently resides in Carrollton, Georgia.  Prior to Southwire's acquisition of Alflex, Mr. Temblador was an employee and agent of Alflex, and he worked at Alflex's offices in Long Beach, California and resided in California.

## JURISDICTION AND VENUE

83.    This Court has jurisdiction over Encore's counterclaims pursuant to 28 U.S.C. §§ 1331, 1338, 2201, and 2202.  This Court has supplemental jurisdiction over Encore's state law claims pursuant to 28 U.S.C. § 1367.

84.    Southwire is subject to personal jurisdiction and venue in the Eastern District of Texas by virtue of its contacts with the State of Texas and this District in particular.  As the Plaintiff in this case, Southwire has consented to the jurisdiction and venue of this Court by initiating this action.

## ALLEGATIONS RELEVANT TO
## ANTICOMPETITIVE AND UNFAIR CONDUCT

***Southwire's "Slick" Wire Patents.***

85.    Southwire is listed as the assignee of U.S. Patent No. 7,411,129 entitled "Electrical Cable Having a Surface with Reduced Coefficient of Friction" (the "'129 Patent"). The '129 Patent issued on August 12, 2008.

86.    Southwire is listed as the assignee of U.S. Patent No. 7,557,301 entitled "Method of Manufacturing Electrical Cable Having Reduced Required Force for Installation" (the "'301 Patent").  The '301 Patent issued on July 7, 2009.

87.     Southwire is listed as the assignee of U.S. Patent No. 7,749,024 entitled "Method of Manufacturing THHN Electrical Cable, and Resulting Product, with Reduced Required Installation Pulling Force" (the "'024 Patent").  The '024 Patent issued on July 6, 2010.  *See* Exhibit 3, '024 Patent.

88.     The '129 Patent, the '301 Patent and the '024 Patent all ultimately flowed from the same initial application through continuations or continuations-in-part.  Application Serial No. 10/952,294 (the "'129 Patent Application") issued as the '129 Patent.  Southwire's '301 Patent is a continuation of the '129 Patent Application.  The '024 Patent is a continuation-in-part of U.S. Patent Application Serial No. 11/120,487, filed May 3, 2005, which is a continuation-in-part of the '129 Patent Application.

### *Southwire's Attempts to Exploit Its Slick Wire Patents.*

89.     Southwire has aggressively asserted its patents against two specific competitors.

90.     On August 12, 2008, the day the '129 Patent issued, Southwire sued Cerro Wire Corporation in this Court, claiming that Cerro infringed the '129 Patent.  Cerro filed a request for *inter partes* reexamination of the '129 Patent.  After the *inter partes* reexamination was granted, this Court stayed that case until the *inter partes* reexamination was complete.   Subsequently, the Patent Office has rejected, finally all claims of the '129 Patent.  The case remains stayed to this day.

91.     On July 7, 2009, the day the '301 Patent issued, Southwire sued Encore and Cerro in the Eastern District of Texas, alleging that both infringed the '301 Patent.  Both Encore and Cerro subsequently filed requests for *ex-parte* reexamination of the '301 Patent.  Both requests for *ex-parte* reexamination have been granted, all the claims of the '301 Patent have been

rejected by the Patent Office, and Southwire has amended all the independent claims of the '301 Patent in response to the Patent Office's rejections and has added one new independent claim and two new dependent claims.  Encore and Cerro have filed a motion to stay the '301 Patent litigation, pending the completion of the *ex-parte* reexaminations.  The court has not yet ruled on that motion.

92.    On July 6, 2010, Southwire filed a lawsuit against Encore and Cerro in the Eastern District of Texas, claiming that Encore and Cerro infringe the '024 Patent.

93.    Each of Southwire's slick wire patents suffer from significant flaws and all of the claims of two of the three patents have now been rejected by the Patent Office, yet Southwire continues its aggressive attempts to enforce these unenforceable patents.  On information and belief, these attempts are part of a large scheme by Southwire to obtain and use questionable or unenforceable patents to exclude competitors from relevant markets or gain market share through threats of litigation and litigation.

### *Southwire's Attempts to Exploit its Metal Clad Cable Patents.*

94.    The cable and wire industry comprises firms that manufacture various products, including electricity-conducting metal-clad cables.  A metal-clad cable has an exterior of flexible metal armor or metal cladding.  The metal cladding provides strength, protects the interior wires, and is relatively easy to install due to the fact that it can be directed with greater ease behind walls and in ceilings than traditional methods.  A metal-clad cable's interior has plastic wrapping of the wires, which makes it a better and safer product than other types of armored cables.

95.    On November 9, 2005, Alflex assigned United States Patent No. 6,486,395, entitled "Interlocked Metal-Clad Cable" (the "'395 Patent") to Southwire, and this assignment

was recorded on January 14, 2006.  The '395 Patent was originally issued to Alflex on November 26, 2002.  The named inventor of the '395 Patent is Richard Temblador, who at the time was an employee of Alflex and currently is, upon information and belief, the Director of Product Development, Electrical Division for Southwire.

### (a)    STP4 and the Development of Self-Grounding Metal-Clad Cable Standards.

96.    Underwriters' Laboratories Inc. ("UL") is an industry standards organization that, among other things, certifies electrical products.  UL certification is essential for commercial acceptability of an electrical product, including electrical cabling products.  The UL has panels that adopt and revise industry-wide standards.  In order to obtain UL certification, an electrical product must comply with one or more of these standards.  The panels are generally supervised and administered by nonvoting UL officials.   The voting members of the panels are manufacturers, users, industry consultants, engineers, and local government representatives involved in the electrical codes.

97.    The UL's Standards Technical Panel 4 ("STP4"), which has about 25 panel members, oversees standards for armored and metal-clad cables.  Among those is UL 1569, which incorporates the standards for metal-clad cables.

### (b)      UL's Patent Disclosure Policy and Code of Ethics.

98.     Members of UL's STP's are required, by its Code of Ethics and Patent Disclosure Policy, to disclose any patent or invention they hold or intend to hold that would be required to comply with any UL standard.

99.     The UL has established a mandatory Code of Ethics binding UL Standards Technical Panel (STP) Members.  Section 2.0 of the Code states in part:  "It is essential that all STP Members conform to these principles in performing their duties and carrying out activities on behalf of UL…. Where the Code of Ethics is specific, it should be followed to the letter."

100.     Pursuant to Section 3.11 of the Code of Ethics, panel members must "refrain from disseminating false or misleading information or from withholding information necessary to a full, fair, and complete consideration of the issues before their STP."

101.     Under the Code of Ethics and the UL Patent Policy, which has been in effect since December 13, 2002, as well as under the STP members' understanding of the Code of Ethics and the Patent Policy, an STP member is required to fully disclose any patented invention to UL and the other STP members if a proposed standard may require the use of that patent.

102.     According to the UL Patent Policy, before a proposed standard that may require the use of a patented invention can be adopted, the patent holder must comply with certain procedures.  Section 1.1.2 of the UL Patent Policy is entitled: "Statement from patent holder." This section mandates that "[p]rior to approval" of a proposed standard, UL "shall receive from the identified party or patent holder written assurance in the form of [either]":

(a) a general disclaimer to the effect that such party does not hold and does not currently intend holding any invention the use of which would be required for compliance with the proposed American National Standard or

(b) a statement that a license will be made available without compensation to the applicants desiring to utilize the license for the purpose of implementing the standard or a license will be made available to the applicants under reasonable terms and conditions that are demonstrably free of any unfair discrimination.

103.     Where a patent holder files the above required assurance under Section 1.1.2(b), Section 1.1.4 of the UL Patent Policy provides further that the patent holder's assurance "shall" be incorporated in the standard itself:

**1.1.4 NOTICE** – When UL and ANSI receive from a patent holder the assurance set forth in 1.1.2(b), the standard shall include a note as follows:

NOTE – The user's attention is called to the possibility that compliance with this standard may require use of an invention covered by patent rights.

By publication of this standard, no position is taken with respect to the validity of this claim or of any patent rights in connection therewith. The patent holder has, however, filed a statement of willingness to grant a license under these rights on reasonable and nondiscriminatory terms and conditions to applicants desiring to obtain such a license. Details may be obtained from UL.

104.     A primary purpose of the UL Code of Ethics and the UL Patent Policy is to prevent any single company from secretly capturing the industry standard and to prevent an unscrupulous member from manipulating the standard-setting process to its advantage.

### *(c)     Southwire Violated Its UL Obligations.*

105.     As set forth below, pursuant to a patent ambush scheme, Alflex (the predecessor of Southwire) subverted the open standards process. After Alflex obtained the '395 Patent in November 2002, it sought UL certification of its new cable product. Because the new cable used

interlocking armor as an equipment grounding conductor, it could not be certified by the UL's then-existing UL 1569 for metal-clad cable.

106.    STP4 is responsible for managing, revising, and maintaining UL 1569 under the supervision of UL administrators.  In 2003, Alflex proposed a revision to UL 1569 to include a new standard for self-grounding metal-clad cable.   The proposed standard's self-grounding technology was covered by Alflex's '395 Patent.  At the time, Alflex was a member of STP4 and was represented by Mr. Temblador, the inventor of the '395 Patent.

107.    On June 30, 2003, STP4 submitted a proposed revision of UL 1569 to the members for comment and vote.  The proposal added the new self-grounding standard, found principally at newly-created Section 6.1.5A of UL 1569.  According to the proposal, a metal-clad cable that is intended for use as a ground path must comply with the new standard set forth in Section 6.1.5A, while a metal-clad cable that is not intended for use as a ground path must comply with the standard set forth in Section 6.1.5.

108.    Alflex's proposed standard reads on the '395 Patent.  That is, the proposed standard required the use of the purported invention covered by the '395 Patent.  Indeed, the summary of the '395 Patent itself indicates that Alflex was pursuing the new standard based upon that invention.

109.    Mr. Temblador, while working for Alflex in California, actively promoted and lobbied the other STP4 members to approve the proposal.  Mr. Temblador and Alflex, however, failed to fully disclose to UL and the UL STP4 members and administrators the '395 Patent and that a license to this patent would be required to make a product conforming to the proposed section 6.1.5A self-grounding metal-clad cable standard, as required by the UL Patent Policy.

Furthermore, Mr. Temblador and Alflex failed to provide written assurances before the standard was adopted, as required by the UL Patent Policy, that either Alflex does not hold a patent the use of which would be required for compliance with the proposed self-grounding metal-clad cable standard, or that a license "without compensation" or "under reasonable terms and conditions that are demonstrably free of any unfair discrimination" would be made available to those desiring to implement the standard.  Rather, it appears that Alflex never intended to license the patent to competitors and that its true goal was to try to exclude competitors from the market.

110.    In violating its mandatory obligation to provide the written notice required by the UL Patent Policy, Alflex deceived UL and the STP4 members into believing that Alflex did not have any actual or potentially blocking patent rights.  This conduct deprived UL and STP4 of the opportunity to develop a standard that avoided reading on the '395 Patent.

111.    In violating its mandatory obligation to provide the written assurance of licensing terms required by the UL Patent Policy, Alflex further acted with the intent to deceive UL and the STP4 members into adopting a standard that did not contain the "NOTE" mandated by section 1.1.4 of the UL Patent Policy that would assure users that to the extent a patent license would be required to make a product covered by the section 6.1.5A self-grounding metal-clad standard, such license would be made available "on reasonable and nondiscriminatory terms and conditions."

112.    On or about March 6, 2004, STP4 adopted, as part of UL 1569, the proposed new standard for self-grounding metal-clad cable set forth in section 6.1.5A.  STP4 would not have issued UL 1569 in its present form—that is, creating a standard covered by the '395 Patent—if

Alflex had fully complied with the mandatory written disclosure and assurance rules of the UL Patent Policy.

113.    By participating in the UL standard-development process without complying with the written disclosure and assurance requirements of the UL Patent Policy, Alflex wrongfully misled and induced STP4 members to promulgate a standard that it now claims is covered by its patent.

114.    Alflex's subversion of UL's rules misled STP4 members into believing that products compliant with the UL 1569 standard for self-grounding metal-clad cables would not be subject to any undisclosed claim to patent rights.

115.    Instead of providing written assurances of a royalty-free license or other reasonable license terms as mandated by UL's Patent Policy "[p]rior to approval" of its proposed new standard (at a time when STP4 could have designed around Alflex's patent rights), Alflex pursued a classic unlawful "patent ambush" strategy.  It strategically waited until its proposed standard had been adopted and the industry had spent money in reliance on the standard before asserting its patent against manufacturers of self-grounding metal-clad cables.

### (d)    *Southwire Implements Its Patent Ambush Plan <u>and Refuses to License the '395 Patent</u>.*

116.    On July 31, 2004, Southwire acquired Alflex as a wholly-owned subsidiary.  At or about the same time, Mr. Temblador became an employee of Southwire.  Alflex assigned the '395 Patent to Southwire on November 9, 2005.  As Alflex's successor, Southwire is fully responsible for all of Alflex's prior conduct.

117.    As the culmination of Southwire's plan to subvert the UL standard-setting process, Southwire has now brazenly asserted patent rights through letters and litigation with respect to the technology described by the self-grounding metal-clad cable standard proposed by Alflex and adopted as a new standard in section 6.1.5A of UL 1569.  Although Encore desires to produce self-grounding metal-clad cable in compliance with UL 1569's section 6.1.5A, Southwire has refused to grant Encore a license to its '395 Patent on any terms, for the purpose of blocking Encore from competing against it in the self-grounded metal-clad cable industry.

118.    In October of 2007, Encore requested that Southwire grant Encore a license to the '395 Patent.  Encore made similar requests in December of 2007, June of 2008, July of 2008, and October 2008.  Despite all of these requests, Southwire never agreed to grant Encore a license to the '395 Patent and never offered a license to Encore under any terms.  Southwire's refusal to license the '395 Patent continued up to and through August 2009, when it sued Encore, alleging that Encore infringed the '395 Patent by making cable that complied with UL 1569.

119.    On information and belief, Southwire has attempted to use similar strategies with other standard setting bodies and electrical codes—attempting to change standards in an effort to exclude competition and adapt the standards or codes to Southwire's products.

### *(e)      The Effects of Southwire's Illegal and Anticompetitive Acts.*

120.    In order to be commercially acceptable in the United States, an electrical cable product must comply with a UL standard.  If the '395 Patent is valid and enforceable and has the scope Southwire asserts, Southwire could have the ability to exclude Encore from producing self-grounding metal-clad cable that is in compliance with section 6.1.5A of UL 1569.

121.    Southwire's misconduct has caused injury to Encore, and Encore will continue to be injured in the future if the relief requested herein is not granted.  Encore's injuries include incurring costs in developing and promoting technology that is in compliance with the industry standard set forth in UL 1569, technology that Encore reasonably believed would be free from such claims, as well as Encore's lost profits.  Encore's injuries also include the costs incurred in defending itself against Southwire in this patent infringement action.

122.    If Southwire's patent assertions against Encore are successful, Southwire will have succeeded in converting the UL standard-setting process from a procompetitive process to one that will serve anticompetitive ends.

## COUNTERCLAIM I
### (Non-Infringement)

123.    The allegations of Paragraphs 1 to 122 above are incorporated by reference.

124.    An actual and justiciable controversy exists between Plaintiff and Encore with respect to the '301 Patent because Plaintiff brought this action against Encore alleging that Encore infringes the '301 Patent.  Absent a declaration of non-infringement, Plaintiff will continue to wrongfully assert the '301 Patent against Encore and thereby cause Encore irreparable injury and damage.

125.    Encore has not infringed the '301 Patent, either directly or indirectly, literally or under the doctrine of equivalents, willfully, or otherwise, and Encore is entitled to a declaration to that effect.

126.    This is an exceptional case, entitling Encore to an award of attorneys' fees and costs incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM II
### (Invalidity)

127.    The allegations of Paragraphs 1 to 126 above are incorporated by reference.

128.    An actual and justiciable controversy exists between Plaintiff and Encore with respect to the '301 Patent because Plaintiff brought this action against Encore alleging that Encore infringes the '301 Patent.  Absent a declaration of invalidity, Plaintiff will continue to wrongfully assert the '301 Patent against Encore and thereby cause Encore irreparable injury and damage.

129.    The '301 Patent is invalid for failure to meet the conditions of patentability of 35 U.S.C. § 101 *et seq.*, including, without limitation, §§ 102, 103, and/or 112.

130.    This is an exceptional case, entitling Encore to an award of attorneys' fees and costs incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM III
### (Declaration of Unenforceability)

131.    The allegations of Paragraphs 1 to 130 above are incorporated by reference.

132.    An actual and justiciable controversy exists between Plaintiff and Encore with respect to the '301 Patent because Plaintiff brought this action against Encore alleging that Encore infringes the '301 Patent.  Absent a declaration of unenforceability, Plaintiff will continue to wrongfully assert the '301 Patent against Encore and thereby cause Encore irreparable injury and damage.

133.     The '301 Patent is unenforceable at least by reason of Plaintiff's inequitable conduct in prosecuting the application thereof in the United States Patent and Trademark Office, and Encore is entitled to a declaration to that effect.

134.     This is an exceptional case, entitling Encore to an award of attorneys' fees and costs incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM IV
### (Unfair Competition - Texas State Law)

135.     The allegations of Paragraphs 1 to 134 above are incorporated by reference.

136.     Over a period of years, Southwire has engaged in a continuing scheme designed to improperly exclude competition from markets for electrical wire by acquiring patents through inequitable conduct and improper acts and omissions during the prosecution of its patents and by acquiring and continuing to aggressively enforce patents that have already been found invalid by the Patent Office.   Southwire has engaged in a wrongful course of conduct designed to appropriate present and potential Encore customers that Encore has acquired through the expenditure of labor, skill and money and to interfere with Encore's actual and prospective business relations with such customers.   Such conduct has resulted in the loss of sales and prospective sales by Encore.   Such conduct is contrary to honest practice in commerce and thus constitutes illegal misappropriation under Texas law, as well as illegal interference with existing and prospective business relations under Texas law.   Southwire's conduct further constitutes unfair competition by both misappropriation and interference with existing and prospective business relations.

137.    Alflex failed to properly and fully disclose to UL and all STP4 members that its proposed revisions to UL 1569 may have required the use of its patented invention, as required by UL's Patent Policy.  Southwire, as the successor-in-interest of the '395 Patent, has asserted the patent against Encore and has refused to license the '395 Patent on any terms after not having complied with the written disclosure and licensing assurance rules of the UL Patent Policy.

138.    Upon information and belief, the Federal Trade Commission (FTC) has issued complaints against companies which have engaged in conduct similar to what Alflex and Southwire did with respect to the '395 Patent under 15 U.S.C. § 45, and these companies settled with the FTC and were prohibited from enforcing the implicated patents unless the patent owners offered licenses based on reasonable and non-discriminatory terms.  The FTC issues such a complaint against a company if it reasonably believes that the company has engaged in unfair methods of competition.

139.    Furthermore, by engaging in a continuing scheme to acquire patents through inequitable conduct and improper acts and omissions during the prosecution of its patents, by acquiring and continuing to aggressively enforce patents that have already been found invalid by the Patent Office, by refusing to comply with UL's rules, including refusing to license its patent for the technology conforming with the UL standard which Southwire itself proposed, and by contacting Encore's actual and prospective customers purporting to warn them that Encore cannot lawfully make self-grounding metal-clad cable or "slick" wire and informing them of Southwire's planned or existing patent infringement suits against Encore, Southwire has engaged in a wrongful course of conduct designed to appropriate present and potential Encore customers that Encore has acquired through the expenditure of labor, skill and money and to interfere with Encore's actual and prospective business relations with such customers.  Such conduct has

resulted in the loss of sales and prospective sales by Encore.  Such conduct is contrary to honest practice in commerce and thus constitutes illegal misappropriation under Texas law, as well as illegal interference with existing and prospective business relations under Texas law.  Thus, Southwire's conduct further constitutes unfair competition by both misappropriation and interference with existing and prospective business relations.

140.    Southwire and its predecessor Alflex have engaged in methods and practices of unfair competition which interfere and threaten to interfere with Encore's ability to conduct its business in violation of the unfair competition laws of the State of Texas.  Southwire's actions have caused injury in fact and financial harm to Encore.  Southwire's unlawful, anticompetitive, and unfair conduct constitutes unfair competition as contemplated by Texas law.  Thus, Encore is entitled to actual and punitive damages, as well as injunctive relief.

## COUNT V:
### (Tortious Interference with Existing and Prospective Business Relations)

141.    The allegations of Paragraphs 1 to 140 above are incorporated by reference.

142.    By engaging in a continuing scheme to acquire patents through inequitable conduct and improper acts and omissions during the prosecution of its patents, by acquiring and continuing to aggressively enforce patents that have already been found invalid by the Patent Office, by refusing to comply with UL's rules, including refusing to license its patent for the technology conforming with the UL standard which Southwire itself proposed, and by contacting Encore's actual and prospective customers purporting to warn them that Encore cannot lawfully make self-grounding metal-clad cable or "slick" wire and informing them of Southwire's planned or existing patent infringement suits against Encore, Southwire has engaged in a wrongful course of conduct designed to appropriate present and potential Encore customers that Encore has

acquired through the expenditure of labor, skill and money and to interfere with Encore's actual and prospective business relations with such customers.  Such conduct has resulted in the loss of sales and prospective sales by Encore.  Such conduct is contrary to honest practice in commerce and thus constitutes illegal interference with prospective business relations under Texas law.

143.    Southwire's intentional interference with Encore's existing and prospective sales proximately caused Encore injury, including lost profits.

## COUNT VI:
### (Misappropriation)

144.    The allegations of Paragraphs 1 to 143 above are incorporated by reference.

145.    By engaging in a continuing scheme to acquire patents through inequitable conduct and improper acts and omissions during the prosecution of its patents, by acquiring and continuing to aggressively enforce patents that have already been found invalid by the Patent Office, by refusing to comply with UL's rules, including refusing to license its patent for the technology conforming with the UL standard which Southwire itself proposed, and by contacting Encore's actual and prospective customers purporting to warn them that Encore cannot lawfully make self-grounding metal-clad cable or "slick" wire and informing them of Southwire's planned or existing patent infringement suits against Encore, Southwire has engaged in a wrongful course of conduct designed to appropriate present and potential Encore customers that Encore has acquired through the expenditure of labor, skill and money and to interfere with Encore's actual and prospective business relations with such customers.  Such conduct has resulted in the loss of sales and prospective sales by Encore.  Such conduct is contrary to honest practice in commerce and thus constitutes illegal misappropriation under Texas law.

146.    Southwire's intentional misappropriation of Encore's customers proximately caused Encore injury, including lost profits.

**COUNT VII:**
**(Unjust Enrichment)**

147.    The allegations of Paragraphs 1 to 146 above are incorporated by reference.

148.    By engaging in a continuing scheme to acquire patents through inequitable conduct and improper acts and omissions during the prosecution of its patents, by acquiring and continuing to aggressively enforce patents that have already been found invalid by the Patent Office, by refusing to comply with UL's rules, including refusing to license its patent for the technology conforming with the UL standard which Southwire itself proposed, and by contacting Encore's actual and prospective customers purporting to warn them that Encore cannot lawfully make self-grounding metal-clad cable or "slick" wire and informing them of Southwire's planned or existing patent infringement suits against Encore, Southwire has used fraud, duress or the taking of undue advantage to enrich itself to the detriment of Encore. Such conduct has resulted in additional sales for Southwire and the loss of sales and prospective sales by Encore and has unjustly enriched Southwire.

149.    Southwire's fraud, duress or the taking of undue advantage to enrich itself proximately caused Encore injury.

**PRAYER FOR RELIEF**

Encore denies that Plaintiff is entitled to be awarded any of the relief sought in its prayer for relief against Encore. Encore has not directly, indirectly, contributorily, and/or by inducement, literally and/or by the doctrine of equivalents infringed – willfully or otherwise –

any valid and enforceable claim of the '301 Patent.  Plaintiff is not entitled to recover damages, interest, costs, fees, or any other type of remedy from Encore.   Plaintiff's prayer should, therefore, be denied in its entirety and with prejudice, and Plaintiff should take nothing therefrom.  Encore asks that judgment be entered for it, and that it be awarded damages, punitive damages, injunctive relief, pre and post-judgment interest and attorneys' fees together with such other and further relief as the Court deems appropriate.

Dated: July 29, 2010                         Respectfully submitted,

                                             /s/ Sanford E. Warren, Jr.
                                             Sanford E. Warren, Jr. (*lead attorney*)
                                             Texas State Bar No. 20888690
                                             swarren@akingump.com
                                             David R. McAtee
                                             Texas State Bar No. 13328000
                                             dmcatee@akingump.com
                                             AKIN GUMP STRAUSS HAUER & FELD LLP
                                             1700 Pacific Avenue, Suite 4100
                                             Dallas, Texas 75201
                                             (214) 969-2800 (telephone)
                                             (214) 969-4343 (facsimile)

                                             E. Glenn Thames, Jr.
                                             Texas State Bar No. 00785097
                                             glennthames@potterminton.com
                                             POTTER MINTON, PC
                                             110 North College, Suite 500
                                             Tyler, Texas 75702
                                             (903) 597-8311 (telephone)
                                             (903) 593-0846 (facsimile)

                                             **ATTORNEYS FOR DEFENDANT
                                             ENCORE WIRE CORPORATION**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 29th day of July 2010, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV-5(a)(3).  Any other counsel of record will be served by a facsimile transmission and/or first class mail.


*/s/ Sanford E. Warren, Jr.*
Sanford E. Warren, Jr. (*lead attorney*)

200002472